# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

TIANA M. ROSSMAN,
Plaintiff,

vs

COMMISSIONER OF
SOCIAL SECURITY,
Defendant.

Case No. 1:11-cv-508
Barrett, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) denying plaintiff's application

for disability insurance benefits (DIB). This matter is before the Court on plaintiff's Statement

of Errors (Doc. 8), the Commissioner's response in opposition (Doc. 13), and plaintiff's reply

memorandum (Doc. 14).

## I. Procedural Background

Plaintiff filed an application for DIB in June 2007, alleging disability since March 6,

2007, due to intractable neuropathic chest pain and depression. Plaintiff's application was

denied initially and upon reconsideration. Plaintiff, through counsel, requested and was granted

two de novo hearings[1] before administrative law judge (ALJ) Deborah Smith. Plaintiff,

plaintiff's husband, a vocational expert (VE), and a medical expert (ME) appeared and testified

at the ALJ hearings. On July 14, 2010, the ALJ issued a decision denying plaintiff's DIB

application. Plaintiff's request for review by the Appeals Council was denied, making the

decision of the ALJ the final administrative decision of the Commissioner.

---

[1] Plaintiff's initial October 28, 2009 hearing was continued to May 12, 2010 as plaintiff was referred to another consultative examiner in order to obtain further medical evidence regarding the etiology of plaintiff's reported physical pain. (Tr. 19).

## II. Medical Evidence

### A. Physical Impairments

Plaintiff underwent gastric bypass surgery in September 2006. (Tr. 388-96). Following the surgery, plaintiff complained to her family practice physician, David Fabrey, M.D., that since her surgery she had experienced pain in the midthoracic region on the right of the back radiating to the chest. (Tr. 405). In December 2006, plaintiff underwent a laparoscopy cholecystectomy (removal of her gall bladder). (Tr. 389, 542).

Plaintiff was treated in the emergency room on December 27, 2006 for complaints of abdominal pain. (Tr. 310-24). A computed tomography (CT) scan of plaintiff's abdomen and pelvis were normal except for the presence of ovarian cysts. (Tr. 317).

Plaintiff returned to the emergency room on February 5, 2007 for severe back and side pain. (Tr. 325-32). Examination results were normal and plaintiff's condition at discharge was noted as "improved." (Tr. 329-30).

An MRI taken of plaintiff's thoracic spine on February 26, 2007 showed no sign of any compressive disc herniation, protrusion or spinal canal compromise. The alignment and vertebral bodies appeared normal. (Tr. 536).

Tammy Musolino, M.D., at Group Health Associates began treating plaintiff on March 6, 2007. (Tr. 526-31). Dr. Musolino ordered MRIs to rule out neoplasm, transverse myelitis based on plaintiff's pertinent history and clinical findings of increasing low dorsal back pain with radiation to her abdomen. (Tr. 529). A lumbar spine MRI taken on March 8, 2007 was normal. (Tr. 524). A thoracic spine MRI taken that same day showed degenerative disc disease identified at the T5-T6, T8-T9, and T9-T10 levels consisting of primarily right anterior lateral osteophyte

2

formations. (Tr. 518-19). At the T9-T10 level, there was a focal moderate sized right anterior extrusion type disc herniation present. *Id.* The radiologist found no posterior disc herniations and no evidence of central canal or neural foraminal stenosis. *Id.* Following the MRI, Dr. Musolino referred plaintiff for a diagnostic and therapeutic injection, either epidural versus nerve blocks and continued her medication. (Tr. 515-16). A March 15, 2007 examination yielded largely normal results, though the examination was stopped several times due to tightness and spasm in plaintiff's right mid low thoracic area. (Tr. 513-14). Plaintiff received trigger point injections in March 2007. (Tr. 333-41, 414).

On April 2, 2007, plaintiff was again treated at the emergency room for severe back pain. (Tr. 342-48). An x-ray of plaintiff's thoracolumbar spine was normal and did not show any acute osseous abnormalities. (Tr. 342). Plaintiff was diagnosed with a T9-T10 disc extrusion without compression as observed on an outpatient MRI, severe intractable thoracic back pain, and chronic Tylenol toxicity. (Tr. 342, 347). Examination results were normal and she had 5/5 strength bilaterally in all extremities. (Tr. 345). Plaintiff was given intravenous steroids and Toradol, which she reported helped with her pain, and she was discharged in stable condition. *Id.*

Plaintiff was seen by Dr. Musolino on April 16, 2007 for follow-up on her thoracic pain. (Tr. 459-60). Plaintiff was noted as being in no acute distress, but was tearful. (Tr. 460). Examination of plaintiff's chest, abdomen, and extremities revealed normal results, but there was tenderness in the midline back around T9-T10 and some spasm was noted on the thoracic paraspinals and low lumbar paraspinals from T4 to T10, greater right than left, but Dr. Musolino reported that there was no significant pain upon palpation. (Tr. 460).

3

Plaintiff consulted with John B. Jacquemin, M.D., an orthopedic specialist on April 16, 2007 due to her complaints of midthoracic back pain radiating around to the front of her chest. She reported that the pain was sharp in nature and radiated around to her abdomen to the front of her chest. She stated that her gallbladder removal did not relieve her pain which was so severe that she stopped working on March 6, 2007. Plaintiff reported that any type of movement or sitting made the pain worse and that she had been unable to do her normal daily activities. During the examination, she was very tearful in regards to her pain and her previous treatment. Her medication at that time included Oxycodone, Toradol, Fentanyl, and Neurontin. She stated she got the most relief out of the Toradol. She also reported seeing a chiropractor, which she stated made the pain worse. She had tried steroids and nerve blocks with no relief. Examination revealed that her gait was normal, without limp or instability, but plaintiff was very guarded when she walked due to the pain in her back. Sensation was intact throughout and she had 5/5 strength in her bilateral upper and lower extremities. Plaintiff was diagnosed with thoracic back pain. Dr. Jacquemin concluded after reviewing plaintiff's MRI that there was no surgical procedure to help with the pain. He opined that the area of T9-10 is probably not the area that is causing or contributing to her pain and plaintiff was referred to pain management. (Tr. 349).

On May 24, 2007, A. Lee Greiner, M.D., a neurosurgeon, examined plaintiff pursuant to a referral from Dr. Musolino. (Tr. 351-62). After examining plaintiff and reviewing her MRI results, Dr. Greiner determined that she was "intact neurologically" and recommended that she undergo a neurosurgical consultation for further evaluation. (Tr. 352, 360).

Plaintiff began seeing Gururau Sudarshan, M.D., a pain specialist, in May 2007. (Tr. 599-601). Plaintiff did not wear a bra at that time due to the pain. (Tr. 600). Upon examination,

4

Dr. Sudarshan opined that plaintiff's pain was strongly suggestive of neuropathic pain syndrome. *Id.* Dr. Sudarshan set up plaintiff for epidural steroid injections and noted that there was a somatic component or spinal related cause to the pain. (Tr. 601). When examining plaintiff in August 2007, he noted severe intractable chest pain. (Tr. 586). On December 4, 2007, Dr. Sudarshan completed a questionnaire wherein he opined that plaintiff was disabled and was unable to perform any substantial gainful employment due to intractable pain and neuropathic pain following bariatric surgery. (Tr. 585).

Plaintiff was examined by Dr. Musolino on May 29, 2007. (Tr. 414-15). Dr. Musolino found that plaintiff was very pleasant and in no acute distress, and examination of the chest, abdomen, and extremities was normal. (Tr. 414). Dr. Musolino found no appreciable tenderness in plaintiff's back, but noted tightness and trigger points, particularly in the thoracic paraspinals region. *Id.* Plaintiff's range of motion in her back was somewhat limited, but with pain. *Id.*

On June 4, 2007, plaintiff returned to the emergency room on the recommendation of her pain specialist due to complaints of chest and left-sided pleuritic pain. (Tr. 364). Plaintiff requested Toradol, claiming that it was the only thing that alleviated her pain. *Id.* Examination results were normal and plaintiff was resting comfortably after receiving Toradol and morphine. (Tr. 365-66). The results of a chest x-ray were unremarkable and plaintiff was discharged. (Tr. 366, 384-85).

On December 31, 2007, Dr. Sudarshan opined that plaintiff continued to deteriorate from the point of view that she is not able to work as any increase in activity results in worsening of pain. (Tr. 581). Dr. Sudarshan opined that plaintiff "is in need of advanced pain methods to control her pain and remains functionally disabled." *Id.* He noted that plaintiff had responded

5

poorly to medications and had been compliant with medication directions, exhibiting no signs of drug abuse. *Id.* Dr. Sudarshan concluded that his clinical impression remained a T5-6 neuropathic pain status post possible nerve injury following gastric bypass surgery. (Tr. 582). She will need advanced pain treatments such as spinal cord stimulation or intrathecal opioid trial to optimize her pain control. *Id.* Dr. Sudarshan continued to treat plaintiff until at least May 2010. (Tr. 577-79, 688-702, 800).

State agency physician Myung Cho, M.D., reviewed the file in November 2007 and completed a physical residual functional capacity (RFC) assessment. (Tr. 565-72). Dr. Cho opined that plaintiff could lift and/or carry and push and/or pull up to 50 pounds occasionally and 25 pounds frequently; stand and/or walk about six hours in an eight-hour workday; and sit for about six hours in an eight-hour workday. (Tr. 566). Dr. Cho acknowledged that plaintiff reported severe chest pain since undergoing gastric bypass surgery in September 2006, but also noted multiple return-to-work statements, several musculoskeletal and neurological examinations within normal limits, as well as normal lumbar, thoracic, and chest x-rays. (Tr. 566). Dr. Cho deemed plaintiff's allegations "partially credible" and opined that the reported symptoms are disproportionate to what would be expected. (Tr. 570). State agency physician Jerry McCloud, M.D., affirmed Dr. Cho's assessment in February 2008. (Tr. 573).

Plaintiff began treating at the Veteran's Administration Hospital (VA) in March 2008. Given her history and examination, her initial diagnoses included chronic neuropathic chest wall pain without a clear etiology and chronic back pain. (Tr. 679-81). In April 2008, her diagnoses included chronic pain syndrome. (Tr. 616).

6

On December 7, 2009, plaintiff was examined by a consultative physician, William O. Smith, M.D., a neurosurgeon, who examined plaintiff at the request of the ALJ following the first administrative hearing. (Tr. 708-20). Dr. Smith noted that plaintiff "showed a good deal of pain behavior during the exam. She cried a lot. She kept an ice pack beneath her breasts at all times." (Tr. 709). On examination, Dr. Smith found plaintiff's range of motion, sensation, and fine motor coordination was normal, her strength was 5/5 in all muscle groups, and she walked normally. (Tr. 709-10). He noted that plaintiff could raise up on her toes and heels, bend 90 degrees, and hyperextend her back and bend laterally without difficulty. (Tr. 710). She was hypersensitive in her chest area. *Id*. Plaintiff reported that she did not drive due to all the medication she was on. *Id*. She also reported that she had seen a pain management specialist, who had considered a spinal cord stimulator and/or a morphine pump, but "[s]he has had neither of these procedures." *Id*. Dr. Smith diagnosed plaintiff with neuropathic pain at T5-6 bilaterally, right greater than left, etiology undetermined, recovering alcoholism, and obesity. *Id.* Dr. Smith "seriously" doubted that plaintiff could work 6 or 8 hours a day, "even in a sedentary type job." *Id.* Dr. Smith opined that plaintiff could lift and carry up to only ten pounds occasionally; sit for only 30 minutes at a time and four hours total in an eight-hour workday; stand for only five minutes at a time and 40 minutes total in an eight-hour workday; and walk for only 15 minutes at a time and two hours total in an eight-hour workday. (Tr. 715-16). Dr. Smith further opined that plaintiff could never engage in overhead reaching and only occasionally do other reaching. (Tr. 717). Dr. Smith found that plaintiff could not shop, walk a block on uneven surfaces, care for her personal hygiene, or sort and handle paper files due to her pain. (Tr. 720).

7

## B. Mental Impairments

On October 3, 2007, plaintiff was evaluated by a consultative psychologist, James Rosenthal, Psy.D. (Tr. 545-49). Plaintiff reported that she straightened her house during the day; ran errands a couple times a weeks; paid bills from home; rested with ice packs on her chest and side if she experienced a lot of pain; napped in the afternoon; helped with folding laundry and sweeping, although her children do most of the housework; grocery shopped weekly for up to 30 minutes; bathed every two or three days; read fantasy books weekly; watched three to four hours of television per day; and used the computer in her free time. (Tr. 548). Dr. Rosenthal diagnosed adjustment disorder with mixed anxiety and depressed mood and assigned plaintiff a Global Assessment of Functioning (GAF) score[2] of 63. *Id.* The DSM-IV categorizes individuals with GAF scores of 61 to 70, as having "some mild" symptoms who are "generally functioning pretty well." *See* DSM-IV at 32. (Tr. 549). Dr. Rosenthal opined that plaintiff was not impaired in her ability to understand, remember, and follow simple one or two-step job instructions and in her ability to relate to supervisors, co-workers, and the general public. (Tr. 549). He found that plaintiff was mildly impaired in her ability to sustain attention and concentration and complete daily work tasks and in her ability to tolerate the stress of day-to-day employment "due to her symptoms of depression and anxiety in response to current life stress." *Id.*

State agency medical consultant Cynthia Waggoner, Psy.D., reviewed the record and completed a Mental Residual Functional Capacity (RFC) Assessment and a Psychiatric Review

---

[2] A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, p. 32 (4th ed., text rev. 2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning." *Id.* The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 34.

8

Technique form on November 2, 2007. (Tr. 551-63). Dr. Waggoner opined that plaintiff had no restriction of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation of an extended duration. (Tr. 561). She further determined that the evidence did not establish the presence of the "C" criteria. (Tr. 562). Dr. Waggoner concluded that "[t]here is no evidence of a severe impairment based on medical evidence as a whole. Although [plaintiff] has been diagnosed with adjustment disorder, she is no more than mildly limited as a result. . . . [Plaintiff's] allegations are credible in nature but not severity." (Tr. 563). Todd Finnerty, Psy.D., affirmed Dr. Waggoner's assessment on February 19, 2008. (Tr. 575).

Plaintiff underwent a mental health screening as part of her initial work-up at the VA (Tr. 686), and based on the results, she began receiving treatment with mental health services at the VA in February 2009. (Tr. 660-69). Rizwan Ilyas, M.D., treated plaintiff and his notes reflect diagnoses of major depressive disorder and chronic pain syndrome. (Tr. 616, 630-33, 647-50, 658-60). On May 29, 2009, plaintiff cried during portions of her evaluation, described her mood as "very depressed, very black," exhibited a depressed affect, and related chronic suicidal thoughts; plaintiff was assigned a GAF score of 60.[3] (Tr. 649). In July 2009, plaintiff was reported as having a broad affect and "sleepy" mood, but otherwise was noted as being fully oriented, having a cooperative attitude, intact thought process, fair insight and judgment, and average intelligence and was assigned a GAF score of 62. (Tr. 643-44). Plaintiff was evaluated on September 15, 2009 and demonstrated similar psychological findings but a depressed affect and mood. (Tr. 632). Dr. Ilyas assigned plaintiff a GAF score of 62. *Id.*

[3] The DSM-IV categorizes individuals with scores of 51-60 as having "moderate" symptoms. *See* DSM-IV at 34.

9

On September 15, 2009, Dr. Ilyas completed a questionnaire wherein he noted that he had been treating plaintiff for major depressive disorder, and opined that she was "disabled." (Tr. 707). He further opined that she was unable to perform any substantial gainful employment due to continued major depressive disorder, and continued pain which has made her response to treatment slow and resulted in a continued inability to function. *Id.*

When seen by Dr. Ilyas in January 2010, plaintiff discussed her overdose from the previous month: "She had over dosed on 2 Effexor about 5 Methadone 'I was just picking a little of everything' 4 - 5 tablets of different medications 2 of cardiac medications and Ambien and drank alcohol." (Tr. 732). Dr. Ilyas assigned plaintiff a GAF score of 60 at that time. (Tr. 734). In March, 2010, plaintiff reported that she was better on Effexor but was still depressed and had crying spells. (Tr. 726).

In March 2010, plaintiff reported suicidal thoughts but no plan or intent. (Tr. 725). She continued with crying spells and chronic sleep problems. (Tr. 726). In April 2010, plaintiff again related she was having some suicidal thoughts and was provided with the suicide prevention phone number. (Tr. 723).

Plaintiff was hospitalized from May 16 - 19, 2010 following a suicide attempt by drug overdose. (Tr. 749-98). Throughout this hospitalization plaintiff was reported as being distraught and depressed with a constricted affect (Tr. 792), having hysterical weeping spells (Tr. 770, 772, 790), and was assigned GAF scores of 30. (Tr. 759, 768, 780).

## C.    Medical Expert

ME Malcolm Brahms, M.D., testified at the October 28, 2009 and May 12, 2010

administrative hearings. At the first hearing, Dr. Brahms testified that plaintiff's condition did not meet or equal any Listings. (Tr. 52). Dr. Brahms noted that there was not a comprehensive neurological evaluation to explain the neurological involvement.[4] (Tr. 60). Dr. Brahms opined that there is no concrete evidence of T5 nerve damage capable of causing plaintiff's back and chest pain other than her subjective reports. (Tr. 61).

At the May 12, 2010 administrative hearing, Dr. Brahms testified that his opinion had not changed after reviewing Dr. Smith's evaluation. (Tr. 89). He was still of the opinion that plaintiff's condition did not meet or equal a listing. *Id.* Dr. Brahms acknowledged that the objective medical evidence is not of such severity that can be reasonably expected to produce the pain alleged. (Tr. 89-90). He further testified that he did not agree with Dr. Smith's assessment regarding plaintiff's physical limitations in light of the normal examination findings. (Tr. 91). Dr. Brahms noted that Dr. Smith's opinion was based "principally on subjective evidence not objective [evidence]." (Tr. 93). Dr. Brahms concluded that plaintiff was capable of performing medium work. *Id.*

## III. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A)

---

[4] Based on this testimony, the ALJ obtained a consultative evaluation which was performed by Dr. Smith. (Tr. 708-20).

11

(DIB). The impairment must render the claimant unable to engage in the work previously

performed or in any other substantial gainful employment that exists in the national economy.

42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation

process for disability determinations:

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (citing §§ 404.1520(a)(4)(i)-

(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the

sequential evaluation process. *Id.*; *Wilson* v. *Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir.

2004). Once the claimant establishes a prima facie case by showing an inability to perform the

relevant previous employment, the burden shifts to the Commissioner to show that the claimant

can perform other substantial gainful employment and that such employment exists in the

12

national economy. *Rabbers*, 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th Cir. 1999).

## B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

1. The claimant met the insured status requirements of the Social Security Act through December 31, 2011.

2. The claimant has not engaged in substantial gainful activity since March 6, 2007, the alleged disability onset date (20 C.F.R. 404.1571 *et seq.*).

3. The claimant has the following severe impairments: major depressive disorder, borderline personality disorder, history of alcoholism, chronic pain syndrome, neuropathic pain, and obesity (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526).

5. After careful consideration of the entire record, the [ALJ] finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b). Mentally, the claimant is limited to performing simple, routine, repetitive work without strict production quotas.

6. The claimant is capable of performing past relevant work as a check cashier. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7. The claimant has not been under a disability, as defined in the Social Security Act, from March 6, 2007, through the date of this decision (20 CFR 404.1520(f)).

(Tr. 12-21).

13

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545–46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

## D. Specific Errors

On appeal, plaintiff raises four assignments of error: (1) the ALJ erred in weighing the medical opinions of record; (2) the ALJ erred in formulating plaintiff's RFC; (3) the ALJ erred in assessing plaintiff's credibility and complaints of disabling pain; and (4) the ALJ erred in relying on answers from the vocational expert which were based on improper hypothetical questions. Plaintiff's first two assignments of error will be addressed together.

1. The ALJ erred in weighing the medical opinions of record and in formulating plaintiff's RFC.

Plaintiff contends the ALJ erred by giving "significant weight" to the ME, Dr. Brahms, giving "less weight" to her treating pain specialist, Dr. Sudarshan, "little weight" to her treating psychiatrist, Dr. Ilyas, and "less weight" to consultative examiner, Dr. Smith. Plaintiff argues that the opinions of Dr. Sudarshan and Dr. Ilyas should have been given great, if not controlling, weight, due to their respective specialty areas and status as plaintiff's treating doctors and, further, that Dr. Smith's opinion should have been given greater weight due to his opportunity to examine plaintiff. Plaintiff also claims that the ALJ erred by giving the most weight to Dr. Brahms given his status as a retired orthopedic surgeon and his previous censure by the Ohio Medical Board for failing to report previous legal actions taken against him. Further, plaintiff asserts that the ALJ erred in formulating her RFC by not properly accounting for the effects of her pain disorders and mental impairments. Plaintiff's arguments are, in part, well-taken.

"In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525,

529-30 (6th Cir. 1997). Likewise, a treating physician's opinion is entitled to weight substantially greater than that of a nonexamining medical advisor. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Lashley v. Sec'y of H.H.S.*, 708 F.2d 1048, 1054 (6th Cir. 1983). The weight given a treating physician's opinion on the nature and severity of impairments depends on whether it is supported by sufficient medical data and is consistent with other evidence in the record. 20 C.F.R. § 404.1527(c)[5]; *Harris*, 756 F.2d 431 (6th Cir. 1985). If a treating physician's "opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case," the opinion is entitled to controlling weight. 20 C.F.R. § 404.1527(c)(2); *see also Walters*, 127 F.3d at 530. If not contradicted by any substantial evidence, a treating physician's medical opinions and diagnoses are afforded complete deference. *Harris*, 756 F.2d at 435. *See also Cohen v. Sec'y of H.H.S.*, 964 F.2d 524, 528 (6th Cir. 1992). The opinion of a nonexamining physician is entitled to little weight if it is contrary to the opinion of the claimant's treating physicians. *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987). If the ALJ rejects a treating physician's opinion, the ALJ's decision must be supported by a sufficient basis which is set forth in his decision. *Walters*, 127 F.3d at 529; *Shelman*, 821 F.2d at 321.

If the ALJ does not give the treating source's opinion controlling weight, then the ALJ must consider a number of factors when deciding what weight to give the treating source's

---

[5] Regulation 20 C.F.R. §§ 404.1527 was amended effective March 26, 2012. The provision governing the weight to be afforded a medical opinion was previously found at § 404.1527(d).

16

opinion. 20 C.F.R. § 404.1527(c). These factors include the length, nature and extent of the treatment relationship and the frequency of examination. 20 C.F.R. § 404.1527(c)(2)(i)(ii); *Wilson,* 378 F.3d at 544. In addition, the ALJ must consider the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(3)-(6); *Wilson,* 378 F.3d at 544. The ALJ must likewise apply the factors set forth in § 404.1527(c)(3)-(6) when considering the weight to give a medical opinion rendered by a non-treating source. 20 C.F.R. § 404.1527(c). When considering the medical specialty of a source, the ALJ must generally give "more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. §§404.1527(c)(5).

At the outset, the Court acknowledges that the ALJ is not required to accept Dr. Sudarshan's or Dr. Ilyas' opinions that plaintiff is unable to perform any substantial gainful employment. (Tr. 585, 707). Whether a person is disabled within the meaning of the Social Security Act, *i.e.*, unable to engage in substantial gainful employment, is an issue reserved to the Commissioner and a physician's opinion that his patient is disabled is not "giv[en] any special significance." 20 C.F.R. § 404.1527(e). *See Warner v. Comm'r of Soc. Sec.,* 375 F.3d 387, 390 (6th Cir. 2004) ("The determination of disability is ultimately the prerogative of the Commissioner, not the treating physician.") (citation and brackets omitted).

Dr. Sudarshan, a pain specialist, was plaintiff's treating physician from May 2007 to, at least, August 2009. (Tr. 576-613, 688-702). Dr. Sudarshan opined, *inter alia*, that plaintiff had

17

intractable, neuropathic pain resulting from her bariatric surgery that functionally limited her from being able to engage in full-time employment. (Tr. 585). Dr. Sudarshan identified that his opinion was supported by findings of significant allodynia at the T5-6 area and MRI findings of degenerative changes in her thoracic spine at T5-6, T8-9, and T9-10. (Tr. 581, 585, 592). The ALJ discounted Dr. Sudarshan's opinions regarding the disabling nature of plaintiff's pain because they were: (1) unsupported by the objective and clinical findings; (2) inconsistent with other medical evidence; and (3) contradicted by Dr. Brahm's opinion. Though there exists record evidence which supports these determinations, the undersigned finds that the ALJ's decision to give "less weight" to Dr. Sudarshan's opinion is without substantial support because the ALJ failed to comply with the requirements of 20 C.F.R. § 404.1527(c).

Under the Social Security regulations, when the ALJ declines to give controlling weight to a treating physician's assessment, "the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley*, 581 F.3d at 406 (citing former 20 C.F.R. § 404.1527(d)). In accordance with this rule, the ALJ must give "good reasons" for the ultimate weight afforded the treating physician's opinion, based on the evidence in the record, and the reasons must be sufficiently specific to enable meaningful review of the ALJ's decision. *Id.* (citing former 20 C.F.R. § 404.1527(d)(2); Social Security Ruling 96-2p, 1996 WL 374188, at *5, *Wilson*, 378 F.3d at 544). The ALJ's failure to adequately explain the reasons for the weight

18

given a treating physician's opinion "*denotes a lack of substantial evidence*, even where the conclusion of the ALJ may be justified based upon the record." *Id*. at 407 (emphasis in the original and quoting *Rogers*, 486 F.3d at 243).

Here, the ALJ failed to consider the requisite factors under 20 C.F.R. § 404.1527(c) in discounting Dr. Sudarshan's opinion. Specifically, the ALJ did not acknowledge that Dr. Sudarshan is a pain specialist or that he consistently treated plaintiff *for pain* for over two years. As noted above, the regulations provide that the opinions of medical specialists relating to their specialization area are generally given more weight than the opinions of non-specialists. 20 C.F.R. § 404.1527(c)(5). Further, in weighing medical opinions the ALJ is to consider the length and nature of the treatment relationship and the frequency of examination. 20 C.F.R. § 404.1527(c)(2)(i)(ii). Yet, the ALJ's decision is silent with respect to Dr. Sudarshan's specialty area and his treatment relationship with plaintiff.

As Dr. Sudarshan was both plaintiff's treating physician and a pain treatment specialist, he was most definitely in a better position to assess the severity of plaintiff's chronic pain syndrome than the non-examining agency physicians. "An ALJ's failure to follow agency rules and regulations 'denotes a lack of substantial evidence . . . .'" *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (citing *Blakley*, 581 F.3d at 407). Accordingly, this matter should be remanded with instructions to the ALJ to appropriately consider the § 404.1527(c) factors as provided by the regulations in weighing the opinion of Dr. Sudarshan in light of his status as plaintiff's treating pain specialist.

Similar to her arguments regarding Dr. Sudarshan, plaintiff asserts that the ALJ also erred in giving only "little weight" to the opinion of Dr. Ilyas, plaintiff's treating psychiatrist. The record reflects that Dr. Ilyas treated plaintiff for depression from May 2009 through April 2010. (Tr. 614-87, 703-07, 722-40). In September 2009, Dr. Ilyas opined that the severity of plaintiff's depression in combination with her pain disorder precluded her ability to perform any substantial gainful employment. (Tr. 707). In support of this opinion, Dr. Ilyas cited to plaintiff's feelings of hopelessness and helplessness, as well as suicidal thoughts. *Id.* The ALJ gave "little weight" to this opinion because "it is inconsistent with the medical evidence as a whole, which suggests only moderate limitations cause[d] by the claimant's mental impairments." (Tr. 20). The ALJ's decision to give "little weight" to Dr. Ilyas' opinion is not substantially supported by the record.

Though the evidence of record with respect to plaintiff's mental impairments includes findings suggesting that plaintiff was only mildly to moderately impaired by her depression in 2007, *see* Tr. 549 (consultative examiner Dr. Rosenthal assigned plaintiff a GAF score of 63 and opined that she was mildly impaired in her ability to sustain attention and concentration, complete daily work tasks, and tolerate the stress of day-to-day employment) and Tr. 563 (non-examining psychologist Dr. Waggoner opined that plaintiff had no more than mild impairments resulting from her depression disorder), the record also includes reports which indicate that plaintiff experienced major depressive episodes in 2009 and 2010 that resulted in greater than moderate limitations. (Tr. 749-98). Thus, while the ALJ's determination that plaintiff has "no more than moderate limitations due to her mental impairments" (Tr. 17) is substantially supported for a discrete period, it does not accurately reflect the whole of the evidence. When

20

one considers the entirety of the evidence pertaining to plaintiff's mental health impairments, it is apparent that the ALJ's decision contains a half-sighted portrayal of the record.

The majority of plaintiff's mental health records consist of Dr. Ilyas' treatment notes from May 2009 through April 2010 which include his observations that plaintiff was consistently depressed, and had frequent crying spells, chronic suicidal thoughts, and suicidal gestures. *See* Tr. 649, 632, 723, 725-56, 732. Plaintiff was hospitalized for five days in May 2010 following a suicide attempt. (Tr. 749-98). During her post-suicide attempt hospitalization, plaintiff was noted as being distraught and depressed with a constricted affect, having hysterical weeping spells, and was assigned a GAF score of 30, indicating an inability to function in almost all areas.[6] (Tr. 759, 768, 770, 772, 780, 790, 792). On discharge, she was rated as "high risk for suicide." (Tr. 755).

Though the ALJ "has the power and discretion to weigh all of the evidence and to resolve the significant conflicts in the administrative record[,]" *Walters*, 127 F.3d at 531, here, the ALJ's decision fails to reflect the differences in plaintiff's functioning during the relevant time periods, which indicate that plaintiff's depression in 2009 and 2010 was more than a mild to moderate impairment. Rather, the ALJ simply provided that "the medical evidence as a whole . . . suggests only moderate limitations cause[d] by the [plaintiff's] mental impairments." (Tr. 20). Notably, the ALJ's decision fails to address the progression of plaintiff's mental health impairment to the point she attempted suicide in May 2009, resulting in a GAF score of 30. *See* Tr. 14, 18. While the ALJ acknowledged that plaintiff's May 2010 hospitalization indicated "more than moderate

---

[6] *See* DSM-IV at 32.

21

limitations" in plaintiff's functioning (Tr. 18), the ALJ downplayed this evidence by selectively citing to two progress notes from May 19, 2010, stating that plaintiff was "feeling much better" and "appeared to be coping reasonably well and was future oriented." (Tr. 19, citing Tr. 758). The report cited by the ALJ states in context:

> She feels much better today and would like to go home tomorrow. She has arranged family therapy with her daughters, and plans to f/u [follow up] with *partial hospitalization*. Denies si/hi. Plans to have her *mother keep her meds to prevent overdose* in the future/access to meds. . . . Appears to be coping reasonably well and is future oriented.

(Tr. 758). That same date, the medical professionals at the VA Hospital rated plaintiff as "high risk" for suicide on discharge and stated that plaintiff needed to be evaluated weekly. (Tr. 756). Contrary to the ALJ's selective citations which suggest plaintiff's condition resolved following her hospitalization, when plaintiff's functioning upon discharge is viewed in context and in conjunction with her chronic suicidal thoughts and gestures throughout 2009 and 2010, the ALJ's decision finding "only moderate" limitations for the time period of 2009 through 2010 is without substantial support in the record. "[W]hen an ALJ fails to mention relevant evidence in his or her decision, 'the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'" *Bledsoe v. Comm'r of Soc. Sec.*, No. 09cv564, 2010 WL 5795503, at *3 (S.D. Ohio Aug. 31, 2010) (quoting *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981)). Accordingly, the undersigned finds that the ALJ's determination to discount Dr. Ilyas' opinion on the basis that it is inconsistent with the record as a whole is not substantially supported.

In addition, as with Dr. Sudarshan's opinion, the ALJ's decision does not reflect consideration of the requisite regulatory factors in weighing Dr. Ilyas' opinion. As stated above,

22

Dr. Ilyas is plaintiff's treating psychiatrist and the ALJ was required to consider his specialty

area and the nature of his treatment relationship with plaintiff in weighing his opinion. 20 C.F.R.

§ 404.1527(c). As any consideration of these requisite factors is absent from the ALJ's decision,

this matter should be remanded and, upon remand, the ALJ should be instructed to consider the

entirety of the relevant evidence and discuss the § 404.1527(c) factors in determining how much

weight to afford Dr. Ilyas' opinion.

Lastly, plaintiff argues the ALJ erred in giving "less weight" to the opinion of Dr. Smith,

the consultative examining physician, who opined that plaintiff would not be able to work for six

to eight hours in even a sedentary job. (Tr. 710). The ALJ determined that Dr. Smith's opinion

was largely based upon plaintiff's subjective complaints and was not supported by the results of

his physical examination or the objective medical findings as a whole. (Tr. 19). Plaintiff's sole

basis for finding the ALJ's decision erroneous in this respect is that because Dr. Smith had the

opportunity to examine plaintiff, his opinion should have been given more weight than was

afforded to the medical expert's opinion.[7] Plaintiff's argument is not well-taken.

The ALJ noted that Dr. Smith's treatment relationship did not extend beyond his one-

time examination in December 2009. This is an appropriate factor for the ALJ to consider in

weighing Dr. Smith's opinion. 20 C.F.R. § 404.1527(c)(2)(i). As a consultative examiner and

not a treating physician, Dr. Smith's opinion is not entitled to any special deference. *Barker*, 40

F.3d at 794. Further, the ALJ identified that Dr. Smith's examination findings were inconsistent

---

[7] As plaintiff has failed to provide any legal basis supporting her arguments that Dr. Brahms' opinion should have been discounted because of an unrelated procedural misstep before the State Medical Board of Ohio, the Court declines to find that this evidence is relevant to the ALJ's decision-making process.

with his opinion that plaintiff could not perform sedentary work for six to eight hours a day, and was also inconsistent with the whole of the clinical evidence. The ALJ's decision in this regard is supported by substantial evidence of record. *See* Tr. 711-14 (Dr. Smith's examination of plaintiff yielded normal results and full strength throughout); Tr. 329-30, 345 (normal examination results from emergency room visits); Tr. 414-15, 460, 513-14 (Dr. Musolino's treatment notes indicate plaintiff had largely normal examination results aside from complaints of pain, tenderness, and some spasm in the back); Tr. 349 (Dr. Jacquemin's examination yielded normal results). Given the ALJ's articulated and supported rationale, the undersigned finds that the ALJ's decision to give "less weight" to Dr. Smith's opinion is substantially supported by the record.

Plaintiff's related assignment of error concerns the ALJ's finding that she had the RFC to "perform light work as defined in 20 CFR 404.1567(b).[8] Mentally, [plaintiff] is limited to performing simple, routine, repetitive work without strict production quotas." (Tr. 15). In light of the above findings, the Court declines to reach this assignment of error as the ALJ will be required to reassess plaintiff's RFC on remand, including taking into account previously unacknowledged evidence regarding the limitations plaintiff's physical and mental impairments cause, in accordance with this Report and Recommendation.

---

[8] Light work is defined as work involving "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 C.F.R. § 404.1567(b).

## 2. The ALJ's credibility determination is substantially supported.

Plaintiff contends that the ALJ did not follow the standard for assessing her statements about her pain set forth in *Duncan v. Sec'y of H.H.S.*, 801 F.2d 847, 852-53 (6th Cir. 1986). The ALJ determined that the "objective medical evidence was inconsistent with [plaintiff's] subjective allegations about the nature and severity of her pain." (Tr. 16). Plaintiff asserts that her complaints of disabling pain are supported by objective and clinical findings in the record, specifically, a disc extrusion at T9-T10 and associated degenerative changes (Tr. 519); her "severe myofascial syndrome" (Tr. 460-62); findings of trigger points and spasms upon examination (Tr. 414, 515); and documented allodynia at T5-6. (Tr. 580-81). Given these objective and clinical findings, plaintiff contends that it is reasonable to believe she experiences the level of pain and the limitations to which she testified. Further, plaintiff argues the ALJ erred by failing to properly consider plaintiff's "other methods" for dealing with her pain, such as using ice packs on her chest, as required by 20 C.F.R. § 404.1529(c) and Social Security Ruling 96-7p. Lastly, plaintiff asserts the ALJ erred by failing to account for the combined effects of her psychological and physical impairments under 20 C.F.R. § 404.1523 in analyzing her credibility with respect to her reports of severe and debilitating pain.

Pain alone, if the result of a medical impairment, may be severe enough to constitute disability. *Kirk v. Sec. of H.H.S.*, 667 F.2d 524, 538 (6th Cir. 1981). In order to find a claimant disabled on the basis of pain alone, the ALJ must first determine whether there is objective medical evidence of an underlying medical condition. *Duncan*, 801 F.2d at 852-53. If there is, the ALJ must then determine: (1) whether the objective medical evidence confirms the severity

25

of the pain alleged by plaintiff; or (2) whether the objectively established underlying medical impairment is severe enough that it can reasonably be expected to produce the allegedly disabling pain. *Id.* Although the claimant is not required to provide "objective evidence of the pain itself" in order to establish that he is disabled, *id.*, statements about his pain or other symptoms are not sufficient to prove his disability. *Id.* at 852 (citing 20 C.F.R. § 404.1529). The record must include "medical signs and laboratory findings which show that [plaintiff has] a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence . . . would lead to a conclusion that [plaintiff is] disabled." 20 C.F.R. § 404.1529(a).

In addition to the objective medical evidence, the ALJ must consider other evidence of pain, such as evidence of plaintiff's daily activities; the location, duration, frequency and intensity of his pain; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of any medication plaintiff takes; treatment other than medication plaintiff has received for relief of his pain; any measures plaintiff uses to relieve his pain; and other factors concerning his functional limitations and restrictions due to pain. *Felisky v. Bowen*, 35 F.3d 1027, 1037-38 (6th Cir. 1994) (citing 20 C.F.R. § 404.1529).

In light of the ALJ's opportunity to observe the individual's demeanor at the hearing, the ALJ's credibility finding is entitled to deference and should not be discarded lightly. *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001); *Kirk v. Sec. of H.H.S.*, 667 F.2d 524, 538 (6th Cir. 1981). "If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky*, 35 F.3d at 1036. The ALJ's articulation of reasons for crediting or

rejecting a claimant's testimony must be explicit and "is absolutely essential for meaningful appellate review." *Hurst v. Sec. of H.H.S.*, 753 F.2d 517, 519 (6th Cir. 1985) (citing *Zblewski v. Schweiker*, 732 F.2d 75, 78 (7th Cir. 1984)).

Social Security Regulation 96-7p, 1996 WL 374186, at *2 (July 2, 1996), describes the requirements by which the ALJ must abide in rendering a credibility determination:

> It is not sufficient for the adjudicator to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.' It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain *specific reasons* for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

(emphasis added).

Here, the Court must defer to the ALJ's decision to discount plaintiff's complaints of disabling pain because substantial evidence supports a finding that neither prong of the two-part *Duncan* test is satisfied with respect to plaintiff's back and pain conditions. First, substantial evidence supports a finding that the objective evidence of record does not confirm the severity of the pain alleged by plaintiff. Although the record includes objective findings that plaintiff had degenerative disc disease and a herniated disc at T9-T10 (Tr. 342, 518-19), diagnoses of myofascial pain (Tr. 415) and neuropathic pain syndrome (Tr. 600), clinical findings of trigger points and muscle spasm in her back (Tr. 414, 460, 513-14), and allodynia around the T5-6 area (Tr. 581), there is also ample evidence that the objective and examination findings are not of sufficient severity to substantiate plaintiff's pain complaints. *See* Tr. 518-19 (no posterior disc

herniation or evidence of stenosis was present in March 2007 MRI); Tr. 536 (February 2007 MRI of the thoracic spine was normal and showed no signs of compressive disc herniation, protrusion, or spinal canal compromise); Tr. 342 (April 2007 x-ray of thoracolumbar spine was normal); Tr. 366 (June 2007 x-ray of plaintiff's chest was normal); Tr. 329-30, 345, 349, 365-66, 414, 460, 513-14, 709-10 (largely normal examination results from February 2007 to December 2009). Despite plaintiff's argument to the contrary, the ALJ's decision reflects that she appropriately applied the standard under *Duncan* in determining that the record evidence was inconsistent with plaintiff's subjective allegations regarding the severity of her pain. Upon a review of the record, the Court finds that the ALJ's decision in this regard is substantially supported.[9]

Second, there is substantial evidence both supporting and contradicting the ALJ's conclusion that plaintiff's subjective claims of disabling pain are unsubstantiated by the record. On the one hand, Dr. Sudarshan and Dr. Smith both opined that plaintiff's pain precluded her ability to work. (Tr. 581, 710). On the other hand, Dr. Jacquemin, an orthopedic specialist, diagnosed plaintiff with thoracic back pain, origin unknown, but did not opine that her condition caused disabling pain; notably, Dr. Jacquemin's examination of plaintiff yielded normal results throughout. (Tr. 349). Dr. Greiner, a neurosurgeon, examined plaintiff and upon finding "no tender spots," determined that she was "intact neurologically." (Tr. 352). Plaintiff's treating

---

[9] Plaintiff also points to her own subjective testimony as evidence confirming the extent of her alleged limitations and pain, but such subjective evidence does not satisfy the two-part *Duncan* test and cannot alone support a finding of disability. *Duncan*, 801 F.2d at 852; 20 C.F.R. § 404.1529. *See also McCormick v. Sec'y of Soc. Sec.*, 861 F.2d 998, 1003 (6th Cir. 1988).

28

physician, Dr. Musolino, consistently reported normal findings upon examination, aside from some tenderness, tightness, and spasm in her back. (Tr. 414-15, 460, 513-14). Dr. Cho, the reviewing agency physician, opined that plaintiff was capable of engaging in a medium level of work and found that her allegations of pain were only "partially credible" as the level of pain plaintiff described was disproportionate to what would be expected given the objective and clinical findings of record. (Tr. 565-72). Further, plaintiff's examination results from emergency room visits were consistently normal and related treatment notes demonstrate that she was successfully treated for pain with medication. (Tr. 329-30, 345, 365-66). The Court "must defer to an agency's decision 'even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ.'" *Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). As there is substantial evidence supporting the ALJ's conclusion, the Court must defer to the ALJ's decision.

Third, the ALJ properly relied on a number of factors in finding that plaintiff's complaints as to her symptoms and limitations were not fully credible. The ALJ reasonably cited to inconsistencies in the record with respect to plaintiff's reported physical and psychological abilities. For example, the ALJ cited to discrepancies between plaintiff's testimony at the October 2009 hearing where she testified that she was unable to perform any household chores, has difficulty maintaining personal hygiene and sleeping, cannot use the computer or watch television for extended periods, and spends the majority of the day in her recliner (Tr. 48-50) and plaintiff's reports during the October 2007 psychological examination where she reported

29

running errands, helping with laundry an sweeping, and spending three to four hours a day watching television. (Tr. 548). *See Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 805 (6th Cir. 2008) (ALJ may consider activities of daily living in evaluating plaintiff's assertions of pain or ailments) (citing *Walters*, 127 F.3d at 531; 20 C.F.R. § 416.929(a)). In addition, plaintiff testified that she has her husband and daughter take care of paying the bills because her medications make her forgetful (Tr. 56), but plaintiff's husband testified that she manages the household money. (Tr. 58). The ALJ also noted inconsistencies in the record regarding plaintiff's substance abuse, citing to several records where plaintiff failed to report her history of alcoholism and drug abuse to medical providers and/or contradicted her statements that she had not used alcohol since 1997. (Tr. 18) (citing Tr. 327, 344, 546, 631, 680). Plaintiff has not shown that the ALJ erred in this regard. Nor did the ALJ err by failing to consider the side effects of plaintiff's medication or the use of other methods, such as using ice packs, in treating plaintiff's pain in violation of 20 C.F.R. § 1523, as plaintiff asserts. The ALJ acknowledged that plaintiff's medication caused side effects such as fatigue and slurred speech (Tr. 16) and that plaintiff had utilized several methods in order to treat her pain, including the use of ice packs on her chest. (Tr. 15, 18). Accordingly, in light of the evidence considered by the ALJ, the inconsistencies between plaintiff's statements and testimony and other evidence of record, and the deference due to the ALJ in making credibility determinations, the undersigned finds that the ALJ's credibility finding is supported by substantial evidence and should be affirmed.

### 3. The ALJ erred by relying on the VE's testimony.

Plaintiff contends that the ALJ erred by relying upon flawed vocational testimony as: (1) the hypothetical questions presented to the VE failed to account for extra breaks and missed days from work that plaintiff requires; (2) the hypotheticals did not reflect plaintiff's need to use ice packs and to alternate between sitting, standing, and walking due to pain; (3) the jobs cited by the VE were semi-skilled and, consequently, contradicted by the supported limitation that plaintiff is able to perform only simple and routine tasks; and (4) the VE erred when he testified that Dr. Smith's opinion would allow for sedentary work despite Dr. Smith's clear statement that plaintiff was likely unable to do even sedentary work for six to eight hours a day.

In light of the Court's finding that the ALJ failed to properly weigh the opinions of Dr. Sudarshan and Dr. Ilyas, the ALJ's RFC finding is also without substantial support in the record. Consequently, the hypothetical questions presented to the VE do not properly reflect plaintiff's impairments and/or limitations. Accordingly, the ALJ erred by relying on this vocational testimony to carry his burden at Step 5 of the sequential evaluation process. *See White v. Comm'r of Soc. Sec.*, 312 F. App'x 779, 789 (6th Cir. 2009) (ALJ erred in relying on answer to hypothetical question because it simply restated residual functional capacity which did not accurately portray claimant's impairments). Because the ALJ's hypothetical questions failed to accurately portray plaintiff's impairments, the vocational expert's testimony in response thereto does not constitute substantial evidence that plaintiff could perform the work identified by the VE. Therefore, plaintiff's final assignment of error should be sustained.

31

**IV. This matter should be reversed and remanded for further proceedings.**

This matter should be reversed and remanded pursuant to Sentence Four of § 405(g) for further proceedings consistent with this Report and Recommendation. All essential factual issues have not been resolved in this matter, nor does the current record adequately establish plaintiff's entitlement to benefits as of her alleged onset date. *Faucher,* 17 F.3d at 176. On remand, the ALJ should properly evaluate the weight afforded to the opinions of Dr. Sudarshan and Dr. Ilyas and formulate plaintiff's RFC accordingly. The ALJ must clearly articulate the rationale in support of plaintiff's reconsidered RFC finding and provide hypotheticals to the VE that accurately portray plaintiff's impairments. If necessary, the ALJ should elicit testimony from a medical expert with regard to plaintiff's RFC.

Plaintiff requests that the case be remanded to a different ALJ, contending that her May 2010 hospitalization was due in part to the ALJ hearing. (Doc. 8 at 19, citing Tr. 781, 783). "The decision to remand a Social Security case to a different ALJ is generally reserved for the Commissioner." *Card v. Astrue*, No. 3:09-cv-1102, 2010 WL 4643767, at *1 (D. Conn. Nov. 9, 2010) (citations omitted). Plaintiff bears the burden of showing bias or partiality on the part of the original ALJ before a court will order remand to a different ALJ. *Id.* (and cases cited therein). Plaintiff has neither alleged nor shown any bias on part of ALJ Smith in this case. Therefore, plaintiff's request for a remand to a different ALJ should be denied.

**IT IS THEREFORE RECOMMENDED THAT:**

The decision of the Commissioner be **REVERSED** and **REMANDED** for further

proceedings pursuant to Sentence Four of 42 U.S.C. § 405(g).

Date: _8/20/2012_                         *Karen L. Litkovitz*
                                          Karen L. Litkovitz
                                          United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

TIANA M. ROSSMAN,
    Plaintiff,

Case No. 1:11-cv-508
Barrett, J.
Litkovitz, M.J.

vs

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).